# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TEXAS
# WACO DIVISION

| | | |
|---|---|---|
| **WSOU INVESTMENTS, LLC D/B/A** | § | **CIVIL ACTION 6:20-cv-00541-ADA** |
| **BRAZOS LICENSING AND** | § | **CIVIL ACTION 6:20-cv-00544-ADA** |
| **DEVELOPMENT,** | § | |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | |
| | § | |
| **HUAWEI TECHNOLOGIES USA** | § | |
| **INC. ET AL.,** | § | |
| *Defendants.* | § | |

**PLAINTIFF'S REPLY CLAIM CONSTRUCTION BRIEF**

# TABLE OF CONTENTS

I.   U.S. Patent No. 8,429,480 (Case No. 6:20-cv-00544-ADA)................................................. 1

    1.   "hybrid automatic repeat request process" (claims 1, 2, 5, 6, 7, 9, 11-19) ....................... 1

    2.   "the resources are persistently allocated . . . for transmitting the new uplink packet transmission" (claim 2)................................................................................... 3

II.  U.S. Patent No. 9,084,199 (Case No. 6:20-cv-00541-ADA)................................................. 4

    1.   "associated with a quality of the received CQI" (claims 1 and 9)
        ". . . the received channel quality indicator (CQI)" (claim 15)......................................... 4

    2.   "dynamically adjust a CQI channel configuration based on the comparison"................. 5

    3.   "generated by filtering frame based quality metrics over a plurality of frames"
        ". . . filtering frame based quality metrics over a period of more than one frame" ......... 7

    4.   Sole disputed "means for" term ........................................................................................ 8

# TABLE OF AUTHORITIES

**Cases**

*Chef America, Inc. v. Lamb-Weston, Inc.*,
  358 F.3d 1371 (Fed. Cir. 2004) ................................................................................................ 5

*Cisco Sys., Inc. v. TQ Delta, LLC*,
  928 F.3d 1359 (Fed. Cir. 2019) ................................................................................................ 6

*Cont'l Circuits LLC v. Intel Corp.*,
  915 F.3d 788 (Fed. Cir.) ........................................................................................................... 5

*Creo Products, Inc. v. Presstek, Inc.*,
  305 F.3d 1337 (Fed. Cir. 2002) ................................................................................................ 9

*Dayco Prods., Inc. v. Total Containment, Inc.*,
  258 F.3d 1317 (Fed. Cir. 2001) ................................................................................................ 5

*Northrup Grumman Corp. v. Intel Corp.*,
  112 F.3d 1146 (Fed. Cit. 1997) ................................................................................................ 8

*Tech. Properties Ltd. LLC v. Huawei Techs. Co.*,
  849 F.3d 1349 (Fed. Cir. 2017) ................................................................................................ 7

**Rules**

37 CFR § 41.37(c)(iii) ................................................................................................................... 6

I.     **U.S. Patent No. 8,429,480 (Case No. 6:20-cv-00544-ADA)**
       1. **"hybrid automatic repeat request process" (claims 1, 2, 5, 6, 7, 9, 11-19)**

Huawei fails to explain why it should not be judicially estopped from advancing the position here that "a HARQ process [is] defined in the '480 patent and 3GPP Standards." Dkt. 46, 2.  Huawei unequivocally conceded just the opposite in a parallel proceeding before the USPTO. Dkt. 44, 4 (quoting Dkt. 44-2, 10).  Huawei cannot reasonably advance a claim construction here that it represented to the USPTO that "no party" has taken in litigation.  *Id*.

Huawei further undermines its position here by attempting to defend its contrary position before the USPTO.  Huawei argues it correctly asserted that no construction is required in the parallel IPR proceeding because Huawei identified allegedly invalidating references that disclose the same "HARQ process" term verbatim.  Dkt. 46, 5.  Without conceding that *either* validity *or* infringement positions bear on claim construction, WSOU submits that it likewise has identified multiple instances in its infringement contentions where Huawei's documentation expressly invokes the same "HARQ process" term.  Under Huawei's own reasoning, if no construction is required in the IPR proceeding, then no construction is required here.  It is axiomatic that the claimed HARQ process encompasses a HARQ process.

Without offering any expert testimony, or even preserving the right to do so, Huawei asks the Court to accept Huawei's unsupported attorney argument that "'stop and wait protocol' and 'soft combining' are the fundamental mechanisms of a HARQ process." Dkt. 46, 2.  Yet Huawei failed to dispute any of the counter examples in relevant 3GPP documentation identified in WSOU's opening brief.  Dkt. 44, 6.  WSOU identified example documentation confirming that not every HARQ process necessarily requires the combination of "stop and wait protocol" with "soft combining" and that certain HARQ processes can be implemented with *or without* soft combining.  *Id.*, n.1–2.  The cited 3GPP documentation, which Huawei simply ignored, speaks for itself in rejecting Huawei's attempt to universally qualify *all* HARQ processes.

Huawei also fails to inoculate the declaration of Dr. Peter Rysavy, which Huawei submitted as a party admission in the parallel IPR proceeding.  Dkt. 44, 5–6 (discussing Dkt. 44-3, Exhibit

1

B). Instead, Huawei only further weakens its position by offering the unsupported attorney argument that "it is well known that FEC (forward error correction) upgrades a standard ARQ and facilities 'soft combining.'" Dkt. 46, 6. Huawei's attorney argument, offered without any evidentiary support, only undermines its construction. If FEC merely *facilitates* "soft combining," then it cannot be said that FEC *itself* necessarily requires "soft combining" in all instances.

Huawei has not justified its rewrite of the claim language by pointing to the specification of the '480 patent. The *one and only* reference to "stop and wait" and "soft combine" appears in the background section, in the description of an explicit example of "several HARQ issues related to LTE." *Compare* Dkt. 44, 5 (citing '480 patent, 2:6-10) *with* Dkt. 46, 2–3 (citing the same). That background description of disparaged example "issues" cannot reasonably be interpreted as lexicography or disclaimer for the claim language at issue. Moreover, this understanding should be deemed admitted by Huawei's unequivocal representation to the USPTO that the intrinsic evidence contains no lexicography or disclaimer. Dkt. 44, 4 (quoting Dkt. 44-2, 10).

Huawei compounds its error by failing to identify *any* evidence that unambiguously requires its additional extraneous limitations expressed as, ". . . where in the uplink a UE adjusts the PUSCH transmission according to PDCCH and/or PHICH information as detected by the UE." Huawei again ignores that its own IPR declarant, Dr. Peter Rysavy, made no mention of any such alleged extraneous requirements in purporting to summarize HARQ processes in general. Dkt. 44, 5 (citing Dkt. 44-3, ¶ 30). Huawei also failed to defend adding its extraneous limitations merely by pointing to virtually an entire column of the specification. Dkt. 46, 3 (citing '480 Patent, 5:4-59). None of the words "adjusts," "PUSCH transmission," "PDCCH information," or "PHICH information" appear in the cited column, much less as an unambiguous and universal requirement—*for every HARQ process*—arranged precisely as Huawei proposes. It is also telling that Huawei's citation indiscriminately encompasses a discussion of "a downlink subframe" (5:45), even though the claim language in question is recited in an "uplink" context (*e.g.*, 9:59-60). Huawei's additional "adjust" limitations should also be rejected as inconsistent with its admission before the USPTO that the intrinsic evidence contains no lexicography or disclaimer.

Even worse, Huawei ultimately concedes its construction is not unambiguously required by the specification, but rather it is imported, nearly verbatim, from a cherry-picked passage of a document Huawei submitted as *extrinsic* evidence.  Dkt. 46, 4 (citing 46-2, TS 36.213, § 8).  But the cited disclosure does not, on its face, purport to provide a dictionary definition for all "HARQ processes" in general.  That the cited disclosure is not intended to be universally applicable is also confirmed by the statement, at the outset of the document, that its "contents . . . are subject to continuing work within the TSG and may change following formal TSG approval."  Dkt 46-2, Forward, p. 6 of 46.  Huawei has failed to justify its importation of limitations from cherry-picked *extrinsic* evidence, particularly in view of Huawei's contrary admissions before the USPTO.

### 2. "the resources are persistently allocated . . . for transmitting the new uplink packet transmission" (claim 2)

In raising its indefiniteness challenge of claim 2, Huawei points to previously undisclosed testimony of James A. Proctor (Dkt. 46-5).  Prior to filing its response brief, the only notice Huawei provided was that it "may rely on . . . [t]he testimony of Dr. James Proctor, Jr. on the indefiniteness of claim 2 of the '480 patent."  That single statement fails to satisfy the Court's disclosure requirement (in OGP v. 3.3, at 8) because (1) Huawei merely offered a conclusion and (2) it misleadingly identified Mr. Proctor as being a Ph.D, when in fact the *curriculum vitae* he attached to his declaration makes no mention of a doctorate degree.  Because Huawei misidentified Mr. Proctor and opted to keep secret the *substance* of his testimony concerning indefiniteness until the filing of Huawei's response brief, the declaration of Mr. Proctor (Dkt. 46-5) should be disregarded.

Even if the Court were inclined to consider the previously undisclosed testimony of Mr. Proctor, his conclusion that "claim 1 cannot be further limited by being persistently allocated as required by claim 2" should be rejected as inconsistent with the intrinsic evidence.  Dkt. 46, 7-8 (citing Dkt. 46-5, ¶¶ 32-36).  Indeed, because the intrinsic evidence speaks for itself in refuting Huawei's position, no alleged expert testimony is required.  For instance, the specification contains example disclosure consistent with the understanding that resources which had been dynamically allocated may thereafter be persistently allocated.  *See, e.g.*, '480 patent, 7:61-67.  Neither Huawei

3

nor its declarant make any mention of that disclosure. This example disclosure is also consistent with the prosecution history of a European counterpart cited in Huawei's response. There, in remarks accompanying what even Huawei characterizes as merely being a "clarify[ing]" amendment, the applicant stated that "'the persistent allocation is for the re-transmissions and takes place only after the hybrid automatic repeat request function has dynamically allocated the new resources to the new uplink packet transmission.'" Dkt. 46, 7 (quoting Dkt.46-7, 3). Thus, the applicant there expressly confirmed that, consistent with the teachings of the '480 patent, a persistent allocation *may follow* a dynamic allocation.

In view of the intrinsic evidence above, nothing in claim 1 of the '480 patent proscribes that sometime *after* "dynamically allocating resources for transmitting the new uplink packet transmission" (as recited in claim 1) the "resources are persistently allocated for transmitting the new uplink packet transmission" (as recited in claim 2). Method steps need not each be executed simultaneously. Rather, recited steps often expressly or implicitly require a particular sequential order. That a given allocation may be altered over the course of executing *distinct* steps of a claimed method does not render the claim language indefinite.

Accordingly, even if one were to overlook Huawei's failure to preserve its indefiniteness challenge by timely satisfying the notice requirements, Huawei nevertheless has still failed to meet its burden of proving indefiniteness of claim 2 by clear and convincing evidence.

II.   U.S. Patent No. 9,084,199 (Case No. 6:20-cv-00541-ADA)
   1. "associated with a quality of the received CQI" (claims 1 and 9)
      ". . . the received channel quality indicator (CQI)" (claim 15)

According to Huawei, there is a meaningful distinction between "a quality of the received channel quality indicator (CQI)," as recited in the disputed claim language, and, instead, "a quality of a *channel* carrying the received CQI," as Huawei seeks to require by its rewrite of the claim language. Dkt. 46, 12 ("Huawei's inclusion of the word 'channel' clarifies that these limitations are directed to . . . the 'quality of a *channel* carrying the received CQI,' rather than a 'quality of a [channel quality indicator]'" as claimed) (emphasis and alterations by Huawei). Even if one were

4

to take Huawei at its word, this would only underscore that the claim language should control here.

Huawei has not supported its admitted departure from the plain and ordinary meaning by pointing to instances in the specification that refer to a "CQI channel." Dkt. 46, 12 (collecting citations). That the written description repeatedly refers to a "CQI channel," and yet the claim language in question does not, only further underscores that the lack of the word "channel" following CQI should be given meaningful effect. There also is no legal or factual basis to support Huawei's attorney argument that its proposed rewrite is somehow justified ostensibly because otherwise "the purpose of the invention would be frustrated." Dkt. 46, 13. On the contrary, the Federal Circuit expressly rejected such reasoning. *See Chef America, Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371, 1374 (Fed. Cir. 2004) (claim terms should be taken as they appear).

### 2. "dynamically adjust a CQI channel configuration based on the comparison"

Huawei's proposed construction does not purport to *define* the claim language in question. Dkt. 44, 10. Rather, Huawei's proposed construction *repeats the same claim language verbatim* and then impermissibly attempts to insert two extraneous requirements: (1) that it must be "a closed-loop process" and (2) and that the comparison must be "of the short term or long term quality metrics." *Id*. Huawei fails to defend either insertion as being required by claim terms or unambiguously required by either the specification or the prosecution history. *See*, *e.g.*, *Cont'l Circuits LLC v. Intel Corp.*, 915 F.3d 788, 796–97 (Fed. Cir.), *cert. denied*, 140 S. Ct. 648 (2019); *Dayco Prods., Inc. v. Total Containment, Inc.*, 258 F.3d 1317, 1327 (Fed. Cir. 2001).

Huawei fails to justify its insertion of "a closed-loop process" by pointing to a description of an example embodiment in the specification. Dkt. 46, 13-14 (citing '199 patent, 6:50-7:5). Huawei does not even attempt to rebut the observations in WSOU's opening brief concerning this same disclosure. Dkt. 44, 10. Huawei merely responds that this same disclosure "is the only description in the '199 Patent regarding the concept of dynamically adjusting a CQI channel configuration . . . ." Dkt. 46, 14. Huawei's conclusory characterization of the specification is inapposite, as it would still be "improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear

5

indication in the intrinsic record that the patentee intended the claims to be so limited." *Cisco Sys., Inc. v. TQ Delta, LLC*, 928 F.3d 1359, 1364 (Fed. Cir. 2019).  Huawei's false characterization is also refuted by example teachings in the '199 patent relevant to this claim language. *See*, *e.g.*, '199 patent, 3:55-63.  Wholly absent from this example passage is any mention of the "closed-loop" limitation Huawei seeks to add as a required limitation. *Id*.

Huawei also fails to justify its insertion of "a closed-loop process" by pointing to the prosecution history.  Dkt. 46, 14 (citing Dkt. 46-16, Exhibit 8, 3–4).  The cited prosecution history is a passage of an appeal brief before the USPTO which identifies two passages of the specification as providing *example* subject matter corresponding to the claim language in question.  Dkt. 46-16, 4.  This identification of example corresponding subject matter was provided pursuant to federal regulation governing appeal briefs.  *See* 37 CFR § 41.37(c)(iii).  Huawei fails to defend its radical position that complying with a federal regulation by citing exemplary subject matter in the specification somehow gives rise to disclaimer or otherwise warrants importing cherry-picked language from one of the citations as a claim limitation.

Huawei points solely to the claim language as allegedly justifying its interpretation that "by necessity, the comparison must be 'of the short term or long term quality metrics.'" Dkt. 46, 15.  In doing so, Huawei provided no rational basis to dispute (1) that the claimed "comparing" is expressly directed to the "quality metrics" in general and (2) that the claim language uses the word "comprise" to signal an open-ended list for the "quality metrics" term.  Dkt. 44, 11−12. A plain reading of the claim language, therefore, does not proscribe the claimed comparison from involving something other than short-term and long-term quality metrics.  *Id*.  Accordingly, Huawei failed to defend its rewrite against the reasoning set forth in WSOU's opening brief.  *Id*.

Finally, Huawei can hardly fault WSOU for arguing no construction is required for this term, given that (1) Huawei took the exact same position before the USPTO, and further given that (2) Huawei expressly represented to the USPTO that "no party" (including Huawei) sought any particular construction for this term in litigation.  *Compare* Dkt. 44, 10-11 (quoting Dkt. 44-2, 10) *with* Dkt. 46, 15.

### 3. "generated by filtering frame based quality metrics over a plurality of frames"
### ". . . filtering frame based quality metrics over a period of more than one frame"

Huawei fails to meet the exacting burden necessary to establish that alleged prosecution history disclaimer compels Huawei's proposed rewrite of the above claim language. Dkt. 46, 15. The Federal Circuit has instructed that "[t]he doctrine [of prosecution disclaimer] does not apply unless the disclaimer is 'both clear and unmistakable to one of ordinary skill in the art.'" *Tech. Properties Ltd. LLC v. Huawei Techs. Co.*, 849 F.3d 1349, 1357 (Fed. Cir. 2017) (citation omitted).

Huawei's only alleged defense of its disclaimer interpretation is the single, conclusory statement that follows: "[w]ith respect to the Gholmeih and Servais references, the patent applicants distinguished these references by arguing that the '199 Patent's concept of 'filtering' encompassed more than 'generating metrics associated with the received data frames, averaging those metrics, and mapping the averaged metrics to provide a bit error rate estimate.'" Dkt. 46, 16 (citing 46-16, Exhibit 8, at 7). Here, Huawei argues disclaimer arises out of a statement allegedly directed to what is "encompassed" by the claim language. *Id*. Huawei betrays a fundamental misunderstanding of the doctrine, its exacting burden, and the prosecution statement itself.

The statement Huawei quotes (in a parenthetical) as allegedly giving rise to disclaimer is as follows: "[t]he portion of Servais cited by the Examiner as teaching long-term soft decision quality metrics generated by filtering frame based quality metrics over a plurality of frames appears, at best, only to teach generating metrics associated with received data frames, averaging those metrics, and mapping the averaged metrics to provide a bit error rate estimate." 46-16, Exhibit 8, at 7. Here, the applicant did not define what filtering requires. At most, the applicant stated that the claimed "filtering" *does not encompass* the combination of "generating metrics associated with received data frames, averaging those metrics, and mapping the averaged metrics to provide a bit error rate estimate," as disclosed in the Servais reference. Huawei fails to explain how the statement offered during prosecution somehow gives rise to *clear and unmistakable* disclaimer that necessitates rewriting "filtering" as, instead, "processing frame based quality metrics over a plurality of frames in order to reject those long-term soft decision quality metrics

7

that are unwanted," as Huawei proposes. Indeed, Huawei's proposed rewrite appears *nowhere* in the cited prosecution history, much less as a clear and unambiguous disclaimer amenable to only the untethered interpretation which Huawei cuts out of whole cloth.

Huawei ultimately admits (at least tacitly) that its proposed construction has nothing to do with the prosecution history and, instead, it is copied from a non-technical dictionary definition that Huawei cherry-picked (presumably in the hope to raise a non-infringement theory). Dkt. 46, 17. In impermissibly seeking to substitute the patentee's straightforward word choice of "filtering" with extraneous requirements of Huawei's own choosing, Huawei glosses over the analysis of the claim language set forth in WSOU's opening brief. Dkt 44, 12-13. Huawei failed to appreciate, for example, that its singular construction for two distinct terms risks conflating into one what the claim language expressly differentiates. *Id*. Claim 1 refers to "a plurality of *frames*" while claim 9 refers, instead, to "a *period* of more than one frame." In addition, WSOU's opening brief did not identify the differentiation in terms of *quantity*, as Huawei incorrectly suggests. Dkt. 46, 17 n.12. Rather, the differentiation is expressed at least in terms of "*period*" versus "*frame*."

Huawei glosses over the undisputed fact that the claim language in question is "recited in the straightforward context directed to *how* 'long-term soft decision quality metrics are generated,'" not how they are used. Dkt. 44, 12. Huawei's rewrite focuses, instead, on subjective intent as to *why* the filtering itself allegedly must be accomplished. *Id.*, 12-13. This too is error.[1]

### 4. Sole disputed "means for" term

Inconsistent with what it had previously argued, Huawei purports in its response brief to fundamentally alter its proposed construction, and hence the dispute itself, though only after WSOU had already submitted its opening claim construction brief addressing Huawei's original construction. Huawei's fundamentally different, and internally inconsistent construction is now that the corresponding structure should be interpreted as requiring *unspecified* "algorithm(s)"

---

[1] *See Northrup Grumman Corp. v. Intel Corp.*, 112 F.3d 1146, 1160 (Fed. Cit. 1997) ("Absent a clear disclaimer of particular subject matter, the fact that the inventor may have anticipated that the invention would be used in a particular way does not mean that the scope of the patent is limited to that context.").

purportedly spanning multiple pages of the specification. Huawei's construction should be rejected as untimely, inconsistent with prior admissions, and unsupported.

As shown in the highlighted table, *infra*, as of the filing of the WSOU's opening brief, Huawei had maintained that a person of ordinary skill in the art would understand that both the disclosed CQI recovery/decoding unit and the CQI metric generation unit are sufficiently definite structure corresponding to this term (and Huawei still maintains that the decision making unit 34 is sufficiently definite structure for other "means for" terms). Dkt. 44, 14. Without providing *any* evidentiary support, *any* expert testimony, or *any* rational underpinning, Huawei now inconsistently argues—*for the first time in its response brief*—that "the CQI recovery/decoding unit and the CQI metric generation unit . . . are special purpose computer components that do not, by themselves, connote sufficient structure to a person of ordinary skill in the art." Dkt. 46, 19.

Huawei's new position is also internally inconsistent. Huawei newly argues "it is . . . necessary for a particular algorithm to be included in the corresponding structure." *Id*. Setting aside Huawei's failure to explain why, allegedly, this is not also so for the decision making unit, Huawei expressly tethers its newly contrived "algorthim(s)" requirement to only the CQI generation unit (i.e., "CQI generation unit using the algorithm(s) of 13:58-15:38"). Huawei opted to not expressly tether any such requirement to the CQI recovery/decoding unit itself. If Huawei had intended otherwise, it should have more carefully crafted its vacillating construction.

Even if Huawei had persuasively established that the construction for this term should additionally require *algorithmic* structure, and it did not, Huawei's new construction is still untenable. Huawei's proposed construction merely provides a citation spanning multiple pages of the specification. Such a construction fails to specifically identify the "algorithm(s)" allegedly required. Indeed, Huawei's ambiguous use of the suffix "(s)" suggests Huawei has yet to take a position as to whether the cited pages allegedly disclose *more than one* required algorithm. This deficiency in Huawei's proposed construction is itself significant and fatal. A means-plus-function limitation allegedly directed to algorithmic structure does not necessarily need to include *all* disclosed algorithms. *Creo Products, Inc. v. Presstek, Inc.*, 305 F.3d 1337, 1345 (Fed. Cir. 2002).

9

Thus, Huawei's newly proposed construction should be rejected as failing to specifically identify which "algorithm" (in the singular) or "algorithms" (in the plural) are allegedly required.

Huawei also fails to defend its inclusion of a "base station" as necessary structure for this term. According to Huawei, "[t]he only system disclosed in the '199 Patent that comprises the CQI recovery/decoding unit and the CQI metric generation unit is a base station." Dkt. 46, 19 (citations omitted). The operative question here is not what structure allegedly pertains to the claimed "system" recited in the preamble. Rather, as explained in WSOU's opening brief, "'[s]tructure disclosed in the specification is 'corresponding' structure only if the specification or prosecution history clearly links or associates that structure to the function recited in the claim.'" Dkt. 43, 13 (citation omitted). Thus, "[a] means-plus-function clause does not embrace all structure disclosed in the written description, but as § 112(f) (formerly § 112 ¶ 6) dictates, it only embraces the 'corresponding structure' of the recited means." *Id*. Huawei failed to establish that the base station *itself* satisfies the relevant test, and Huawei failed to rebut exemplary disclosure discussed in the opening brief confirming that the base station is not clearly linked or associated as *required* structure to the recited function. Dkt. 44, 15-16 (discussing '199 patent, 15:20-29).

Finally, Huawei opted to not dispute or even acknowledge the explanation in the opening brief that inclusion of the "CQI metric generation unit" is optional and that, at least in certain embodiments, the "CQI recovery/decoding unit" is itself sufficient structure. Dkt. 44, 14-15.[2] As WSOU explained, "[t]o suggest both of those components are necessarily required for all embodiments overlooks the repeated use of the word 'may,' including in the statement, '[t]he CQI metric generation unit 32 *may* further process the metrics and associated signals to provide metrics to the decision making unit 34.'" *Id*. (quoting '199 patent, 6:34-49). Huawei offered no rebuttal. Even further narrowing the issues, Huawei abandoned its prior position that the decision making unit 34 is required structure for this term. *Compare* Dkt. 44, 15 *with* Dkt. 46, 18 n.13.

---

[2] As shown in the table below, WSOU has simplified and clarified its proposed construction, consistent with its position that exemplary disclosure in the specification "identifies the CQI recovery/decoding unit 30 and, *optionally*, the CQI metric generation unit 32 as structure that may generate and provide metrics that relate to the CQI and quality of the R-CQICH." Dkt. 44, 14-5.

10

| WSOU's Position | Huawei's Position |
|---|---|
| **Subject to 35 U.S.C. § 112, ¶6.** | **Subject to 35 U.S.C. § 112, ¶6.** |
| **Function:** "generating soft decision quality metrics from a decoding process for a received channel quality indicator (CQI)" | **Function:** "generating soft decision quality metrics from a decoding process for a received channel quality indicator (CQI)" |
| **Structure**: CQI recovery/decoding unit and, optionally, the CQI metric generation unit; and equivalents thereof.[3] | **Structure (as Huawei originally proposed):** base station that includes a CQI recovery/decoding unit, CQI metric generation unit, and a decision making unit, and equivalents thereof. |
| | **Structure (as Huawei newly proposes):** a base station that includes a CQI recovery/decoding unit, CQI generation unit using the algorithm(s) of 13:58-15:38, and equivalents thereof. |

---

[3] *See* note 1, *supra*.


Dated: March 19, 2021   Respectfully submitted,

By: */s/ Ryan S. Loveless*
James L. Etheridge
Texas Bar No. 24059147
Ryan S. Loveless
Texas Bar No. 24036997
Brett A. Mangrum
Texas Bar No. 24065671
Travis L. Richins
Texas Bar No. 24061296
Jeff Huang
Etheridge Law Group, PLLC
2600 E. Southlake Blvd., Suite 120 / 324
Southlake, TX 76092
Tel.: (817) 470-7249
Fax: (817) 887-5950
Jim@EtheridgeLaw.com
Ryan@EtheridgeLaw.com
Brett@EtheridgeLaw.com
Travis@EtheridgeLaw.com
Jeff@EtheridgeLaw.com

Mark D. Siegmund
State Bar No. 24117055
mark@waltfairpllc.com
Law Firm of Walt, Fair PLLC.
1508 North Valley Mills Drive
Waco, Texas 76710
Telephone: (254) 772-6400
Facsimile: (254) 772-6432

*Counsel for Plaintiff WSOU Investments, LLC*

## CERTIFICATE OF SERVICE

A true and correct copy of the foregoing instrument was served or delivered electronically via U.S. District Court [LIVE]- Document Filing System, to all counsel of record, on March 19, 2021.

*/s/ Ryan S. Loveless*
Ryan S. Loveless